IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

ROBERT HARRISON,                )
                                )
        Plaintiff,              )
                                )
          v.                    )      1:08cv677 (JCC)
                                )
PRINCE WILLIAM COUNTY POLICE    )
DEPARTMENT et al.,              )
                                )
        Defendants.            )

**M E M O R A N D U M   O P I N I O N**

This matter is before the Court on Defendants' Motion
to Dismiss or, in the Alternative, for Summary Judgment.  Two
matters related to Defendants' motion are also before the Court:
first, Defendants' motion to exceed the page limit for their
reply brief, and second, Plaintiff's Rule 56(f) request in
support of its opposition to Defendants' alternative motion for
summary judgment.  For the following reasons, the Court will
grant Defendants' motion to exceed the page limit, grant
Plaintiff's request to construe Defendants' motion as a motion to
dismiss, and grant in part and deny in part Defendants' motion to
dismiss.

**I. Background**

This case arises out of an alleged instance of police
brutality.  The plaintiff, Robert Harrison ("Plaintiff"), an

1

African-American male, claims that the police unreasonably seized him and used excessive force to restrain him.  The use of excessive force and subsequent denial of medical care, he claims, led to a seizure requiring emergency medical treatment.  He further alleges that various members of the police department conspired to cover up the constitutional violations he suffered.

On July 1, 2008, Plaintiff filed a complaint (the "Complaint") against the Prince William County Police Department (the "PWCPD"), Charlie Deane, the Chief of the PWCPD ("Chief Deane"), officers John Mora ("Officer Mora") and Michael Sullivan ("Officer Sullivan"), and ten unidentified John Doe defendants, all PWCPD officers.  The Complaint contains eight claims for constitutional violations and related torts under federal civil rights law (42 U.S.C. §§ 1983, 1985, and 1988) and Virginia common law.  The allegations in the Complaint are as follows.

On the evening of October 4, 2005, Plaintiff and Marquis Christopher ("Christopher") were on their way to Plaintiff's apartment in Woodbridge, Virginia.  Christopher drove, and Plaintiff rode in the passenger seat.  The PWCPD had recently executed an arrest warrant at an apartment close to Plaintiff's dwelling and had blocked the road.  Christopher stopped and asked a female police officer in plain clothes who was standing nearby if he and Plaintiff could proceed.  The officer, Detective Jennifer Evans, identified herself and showed

her badge.  Officer Mora then approached the vehicle, asked
Detective Evans what had happened, and began to yell at Plaintiff
and Christopher.  Plaintiff did not respond; Christopher drove
them into the apartment complex's parking lot.

At this point, Officer Mora moved toward the vehicle
and called for assistance.  He then opened the passenger door,
grabbed Plaintiff's arm, pulled him out of the car, and threw him
against it.  Officer Mora refused to answer Plaintiff's repeated
questions about why he was being arrested.  Two other officers –
John Doe One and John Doe Two – arrived.  They picked Plaintiff
up bodily while Officer Mora put him into a headlock.  Officer
Mora then dropped to the ground, causing Plaintiff's head to hit
the pavement.  Officer Mora ground Plaintiff's head into the
pavement and told him that he "would learn to shut his mouth,
warned [Plaintiff] that if [he] ever saw the female officer again
he should not ever say anything to her," and then punctuated the
warning by calling Plaintiff a "fucking nigger."  Compl. at ¶ 14.

One of the officers who had tackled Plaintiff told
other police officers standing nearby to arrest Christopher as
well.  They did so; they did not respond to Christopher's
questions about what crime he had committed.  The police
officers, including Officer Mora and John Does Three, Four, and
Five, then conferred about what charges to bring against
Plaintiff and Christopher.  During this meeting, Officer Mora

repeated the slur that he had used earlier against Plaintiff. The group decided to charge Plaintiff with "swear and abuse" and both Plaintiff and Christopher with disorderly conduct.[1]  *Id.* at ¶ 18.

Plaintiff noticed that he was seeing double and asked Officer Mora for medical attention.  The police officers at the scene, including Officer Mora and John Does One and Two, refused to provide Plaintiff with medical care.  The officer who drove Plaintiff to the PWCPD's Garfield substation in Woodbridge told him that he would be treated at the substation.  Once there, Plaintiff again requested medical care.  While completing his intake paperwork, John Doe Six responded to Plaintiff's request for medical attention by telling him to wash his face.  This same John Doe defendant attempted to hide papers related to Plaintiff's receipt of medical care from Plaintiff.

Plaintiff and Christopher posted bail and then went to the house of Christopher's mother early in the morning of October 5th.  Shortly after arriving, Plaintiff collapsed and began to have a seizure.  His girlfriend called 911 twice, each time telling the operator that Plaintiff was unconscious and had been beaten by the police earlier that day.  Approximately nine minutes after he began to experience the seizure, PWCPD officers

---

[1] At least two Virginia laws criminalize public cursing and swearing. *See* Va. Code Ann. §§ 18.2-388, 18.2-416.  Virginia's disorderly conduct statute is at Va. Code Ann. § 18.2-415.

John Does Seven, Eight, and Nine arrived.  John Doe Seven began interrogating Plaintiff, asking him whether he had been drinking or using drugs.  Plaintiff could not respond.

About one minute later, an ambulance arrived.  Other emergency medical units pulled up shortly thereafter.  Police officers told emergency medical personnel not to enter the house because it was not secure.  About eight minutes after that, medical personnel were allowed to enter the house and take Plaintiff to the hospital by ambulance.  One PWCPD officer, John Doe Ten, told one of the individuals accompanying Plaintiff not to "act all ghetto" at the hospital.  *Id.* at ¶ 32.  After Plaintiff's family and friends arrived, PWCPD officers prevented them from entering the hospital.  Officer Sullivan went into Plaintiff's hospital room and began asking him about what had happened.  His questions were focused on finding an explanation for Plaintiff's collapse other than the alleged police brutality.

The Complaint contains eight claims: (I) racially-motivated false arrest in violation of the Fourth and Fourteenth Amendments, against Officer Mora; (II) racially-motivated illegal search and seizure in violation of the Fourth and Fourteenth Amendments, against Officer Mora; (III) racially-motivated use of excessive force in violation of the Fourth and Fourteenth Amendments, against Officer Mora, John Doe One, and John Doe Two; (IV) deliberate denial of medical care, in violation of the

Eighth and Fourteenth Amendments, against all Defendants; (V) conspiracy to violate Plaintiff's civil rights, against all Defendants; (VI) equal protection violations, against all Defendants; (VII) racially-motivated assault and battery, against Officer Mora, John Doe One, and John Doe Two; and (VIII) racially-motivated intentional infliction of emotional distress, against all Defendants.  Plaintiff seeks compensatory, nominal, and punitive damages, injunctive relief, costs, attorney's fees, and expenses.

On November 17th, Defendants filed a Motion to Dismiss or, in the Alternative, for Summary Judgment.  Defendants included medical records and an affidavit by one of the police officers involved in the contested incidents.  Plaintiff then filed an opposition to the motions, supported by his affidavit. Defendants submitted a reply brief and additional exhibits.

As noted above, two other motions are germane to Defendants' alternative motion for dismissal or summary judgment. First, Defendants submitted with their reply brief a motion to exceed the page limit for such briefs; Plaintiff did not oppose this motion.  Second, Plaintiff filed a request, pursuant to Rule 56(f), that the Court either refuse to construe Defendants' alternative motion as a motion for summary judgment or grant a continuance to allow Plaintiff to conduct appropriate discovery in order to respond to the summary judgment motion.  Defendants

opposed the Rule 56(f) request.  These Motions are before the Court.

## II.  Standard of Review

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the complaint, *see Randall v. United States*, 30 F.3d 518, 522 (4th Cir. 1994) (citation omitted).  In deciding a motion to dismiss, "the material allegations of the complaint are taken as admitted."  *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969) (citation omitted).  Moreover, "the complaint is to be liberally construed in favor of plaintiff."  *Id.*  A motion to dismiss must be assessed in light of Rule 8's liberal pleading standards, which require only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8.  While Rule 8 does not require "detailed factual allegations," a plaintiff must still provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1964-65 (2007) (citation omitted).

Where "matters outside the pleading are presented to and not excluded by the court," a 12(b)(6) motion may be converted to a motion for summary judgment.  Fed. R. Civ. P. 12(b).  In such an instance, the court is required to give all parties "reasonable opportunity to present all material made pertinent to such motion by Rule 56."  Fed. R. Civ. P. 12(b); *see*

*also Plante v. Shivar*, 540 F.2d 1233, 1235 (4th Cir. 1976). According to the Fourth Circuit, "reasonable opportunity includes some indication by the court to all parties that it is treating the 12(b)(6) motion as a motion for summary judgment, with the consequent right in the opposing party to file counter affidavits or to pursue reasonable discovery." *Plante v. Shivar*, 540 F.2d 1233, 1235 (4th Cir. 1976) (quoting *Johnson v. RAC Corp.*, 491 F.2d 510, 513 (4th Cir. 1974)).

Summary judgment is appropriate only if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See* Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996) (citations omitted). In reviewing the record on summary judgment, "the court must draw any inferences in the light most favorable to the non-movant" and "determine whether the record taken as a whole could lead a reasonable trier of fact to find for the non-movant." *Brock v. Entre Computer Ctrs.*, *Inc.*, 933 F.2d 1253, 1259 (4th Cir. 1991) (citations omitted). Once a motion for summary judgment is properly made and supported, the opposing party bears the burden of showing that a genuine dispute exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

8

## III. Analysis

Both preliminary motions – Defendants' motion to exceed the page limit in its reply brief and Plaintiff's Rule 56(f) request – relate to the timing and contents of the legal memoranda filed by the parties.  Defendants initially submitted a short memorandum in support of their motion to dismiss/motion for summary judgment.  The memorandum stated their legal arguments without significant elaboration.  To rebut Plaintiff's more thorough response in opposition, Defendants filed a thirty-page memorandum and a motion to exceed the page limit set by Local Rule 7(F)(3), which limits reply briefs to twenty pages. Defendants' reply brief contained the bulk of their legal arguments.  Defendants also attached to their reply brief a number of new affidavits and other evidence supporting their motion for summary judgment.  Plaintiff has not opposed Defendants' request to exceed the page limit.

Plaintiff's Rule 56(f) request for an extension of time to conduct discovery or, in the alternative, for the Court to construe Defendants' motion as a motion to dismiss, complains that because new affidavits and factual documentation were submitted with Defendants' reply brief, Plaintiff has not had a sufficient opportunity to conduct responsive discovery.

A. <u>Motion to Exceed Page Limit</u>

The Court in its discretion will grant Defendants' request to exceed the page limit for reply briefs set by the

Local Rules.  Defendants were required to file their initial motion within twenty days after service of process.  Fed. R. Civ. P. 12(a)(1)(A)(i); 12(b).  At that point, Defendants' counsel was still investigating the case and gathering evidence.  Defs.' Mot. to Exceed at 1.  Defendants used the extra pages submitted in their reply brief to discuss this additional evidence and amplify their legal arguments.

In light of the unusual course of briefing in this case, the Court will grant the motion to enlarge the page limit. Memoranda that exceed page limits are the exception rather than the rule.  *See Dag Petroleum Suppliers, LLC v. BP P.L.C.*, 2006 WL 2345908 (E.D. Va. Aug. 9, 2006) (denying Plaintiff's motion to exceed the page limit for its opposing brief).  In this case, however, the Court will grant the motion because (1) it does not appear that Defendants intentionally delayed their investigation into the facts of the case; (2) Defendants' total briefing comes in at less than the total pages that the Local Rules would allow a party that used the entire page limit for both its initial and reply briefs; and (3) the Court is also granting Plaintiff's request to rule on Defendants' motion to dismiss rather than their motion for summary judgment, thus avoiding any prejudice that the excess pages could cause to Plaintiff.

B. <u>Plaintiff's Rule 56(f) Request</u>

Whether to grant a Rule 56(f) continuance is within the discretion of the district court.  *See Gasner v. Bd. of*

*Supervisors of Dinwiddie County*, 103 F.3d 351, 362 (4th Cir. 1996).  The Court finds that ruling on Defendants' summary judgment motion without allowing Plaintiff to conduct discovery related to Defendants' new factual assertions would unduly prejudice Plaintiff.  Plaintiff, for his part, has brought numerous claims against numerous defendants, not all of which state a cause of action.  *See infra* subpart III.C.  Ruling on Defendants' motion to dismiss will sharpen the remaining factual issues while allowing all parties time to gather evidence in preparation for summary judgment and trial.  For these reasons, the Court will grant Plaintiff's request that it construe the alternative motions for summary judgment and dismissal as a motion to dismiss.

    C. <u>Defendants' Motion to Dismiss</u>

       Defendants argue that this action should be dismissed for a number of reasons, including, among others, the statute of limitations for § 1983 actions, qualified immunity, and sovereign immunity.  The Court will address each argument in turn.

    1. <u>Statute of Limitations</u>

       Section 1983 actions are subject to the relevant state's statute of limitations for personal injury actions.  *Wilson v. Garcia*, 471 U.S. 261, 265 (1985).  In Virginia, parties must bring personal injury actions within two years.  Va. Code Ann. § 8.01-243; *see Glascock v. Laserna*, 439 S.E.2d 380, 381 (Va. 1994).  Plaintiff originally filed a complaint in this case

on October 4, 2007 – exactly two years after the rights violations allegedly took place.[2]

Plaintiff's original complaint was assigned the case number 1:07cv999. It was stamped "filed" at 5:03 p.m. on October 4 and was electronically filed on October 9. Defendants argue that the time at which the complaint was stamped – three minutes after the posted office hours for the clerk's office – falls outside the statute of limitations and bars Plaintiff's claims.

The Court disagrees. First, the clerk accepted the filing on the last day included within the statute of limitations period. The statute of limitations inquiry looks to the date of filing; neither the Federal Rules of Civil Procedure nor the Local Rules sets a specific time after which a filing is not considered timely. If the clerk accepts a filing on or before the last date within the applicable time period, the Court is satisfied that it was timely. Second, regardless of when the complaint was filed electronically, Plaintiff submitted it on the date stamped on the paper copy. The statute of limitations required Plaintiff to bring suit by October 4, 2007. The date-stamped copy of his initial complaint shows that he did so.

---

[2] Plaintiff voluntarily dismissed the first complaint on February 14, 2008. The suit was re-filed as the instant case, 1:08cv677, on July 1, 2008, within the six-month tolling period provided by Va. Code Ann. § 8.01-229(E)(3). *See Scoggins v. Douglas*, 760 F.2d 535, 536-38 (4th Cir. 1985). Defendants did not raise a statute of limitations argument based on the re-filing date.

2. Qualified Immunity

Police officers sued under § 1983 have the benefit of qualified immunity, which protects them from civil suits when their performance of discretionary functions "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified immunity is an immunity from suit, not merely a defense to liability.  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); *see Sigman v. Town of Chapel Hill*, 161 F.3d 782, 786 (4th Cir. 1998).

In *Saucier v. Katz*, the Supreme Court set out a two-step inquiry for lower courts to use to determine whether the defense applies.  533 U.S. 194, 201-02 (2001).  The decision specified both prongs of the inquiry and the order in which each must be considered.  First, a court determines whether, "[t]aken in the light most favorable to the party asserting the injury," the facts alleged by that party "show the officer's conduct violated a constitutional right."  *Id*. at 201.  If a constitutional violation did occur, the court then asks "whether the right was clearly established."  *Id*. at 202.  In making this second inquiry, the court "ascertains 'whether a reasonable [official] could have believed [the challenged conduct] to be lawful, in light of clearly established law.'" *Meeker v. Edmundson*, 415 F.3d 317, 323 (4th Cir. 2005) (quoting *Anderson v.*

13

*Creighton*, 483 U.S. 635, 641 (1987)).

In a recent case, the Supreme Court held that the sequence of inquiry required by *Saucier* is no longer mandatory. *Pearson v. Callahan*, __ S. Ct. ____, 2009 WL 128768, at *9 (Jan. 21, 2009).  Judges "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Id.*  With this in mind, the Court turns to the allegations of constitutional violations in the Complaint.

a. <u>Counts I-II: False Arrest; Illegal Search and Seizure</u>

The first and second claims, for false arrest and illegal search and seizure, are directed against Officer Mora alone.  Both claims turn on whether Officer Mora had probable cause to seize and arrest Plaintiff.  "In a § 1983 action, the lawfulness of an arrest is determined under the law of the state in which the arrest was made."  *Robinson v. Goff*, 517 F. Supp. 350, 353-54 (D. Va. 1981).  In Virginia, probable cause must justify an arrest.  *Id.*  Thus, an allegation that an officer conducted a warrantless arrest without probable cause can state a claim for false arrest.  *See Porterfield v. Lott*, 156 F.3d 563, 568 (4th Cir. 1998); *see also Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979).

As to the illegal search and seizure claim, the Fourth

14

Amendment forbids unreasonable searches and seizures.  U.S. Const. amend. IV.  A search and seizure conducted without a warrant, as in the situation presented here, requires probable cause.  *See Brinegar v. United States*, 338 U.S. 160, 164, 175-76 (1949).  Probable cause exists when a police officer has knowledge of facts and circumstances that would allow "a man of reasonable caution" to believe that an offense "has been or is being committed."  *Id.* at 175 (citation omitted).

Defendants do not dispute Plaintiff's claim that he was physically "seized" under the Fourth Amendment and formally arrested.  *See Cal. v. Hodari D.*, 499 U.S. 621, 624 (1991).  The question, then, is whether the officer had probable cause for the warrantless seizure and arrest of Plaintiff.  The facts, as recounted in the Complaint, state that Plaintiff did nothing to lead Officer Mora to believe that a crime had been or was being committed.  *See* Compl. at ¶¶ 9-11.  For the purposes of a motion to dismiss, this is sufficient to allege that Officer Mora did not have probable cause to seize or arrest Plaintiff.  Plaintiff, then, has stated valid claims for the constitutional violations of false arrest and illegal search and seizure.

The second qualified immunity inquiry asks whether the violated right was clearly established at the time of the alleged violation.  The requirement that an officer have probable cause to seize and arrest an individual has been clearly established constitutional law for decades.  At this stage of the litigation,

15

then, Officer Mora is not entitled to qualified immunity for the
first or second claims.

### b. Count III: Excessive Force

Plaintiff claims that Officer Mora and Officers John
Doe One and John Doe Two used excessive force to arrest him, in
violation of the Fourth and Fourteenth Amendments (Count III).
The Complaint alleges that, while Plaintiff was being held bodily
above the pavement, Officer Mora put him in a headlock and then,
with the aid of John Does One and Two, dropped to the ground,
hitting Plaintiff's forehead against the pavement.  It also
states that Officer Mora ground Plaintiff's head into the
pavement in a circular motion.  Compl. at ¶¶ 13-14.

When a plaintiff alleges that an officer has used
excessive force, the officer's actions are analyzed under an
objective reasonableness standard.  *Graham v. Connor*, 490 U.S.
386, 388 (1989).  The "reasonableness" of a use of force "must be
judged from the perspective of a reasonable officer on the scene,
rather than with the 20/20 vision of hindsight."  *Id.* at 396
(citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)).  The inquiry
must take into account that "police officers are often forced to
make split-second judgments – in circumstances that are tense,
uncertain, and rapidly evolving – about the amount of force that
is necessary in a particular situation."  *Id.* at 396-97.

*Graham* provides three factors to guide the objective
reasonableness inquiry: (1) "the severity of the crime"; (2)

16

"whether the suspect poses an immediate threat to the safety of the officers or others"; and (3) whether the suspect is resisting arrest or attempting to flee.  *Id.* at 396.

i. Officer Mora – Constitutional Violation

The Complaint alleges that Plaintiff did not commit a crime and that Officer Mora did not have probable cause to suspect him of committing a crime.  When the suspect has not committed a crime, the first "objective reasonableness" factor weighs heavily in his favor.  *Bailey v. Kennedy*, 349 F.3d 731, 743-44 (4th Cir. 2003).  Likewise, as the Complaint alleges that Officer Mora knew that Plaintiff had committed no crime, it is unlikely that Mora reasonably could have viewed Plaintiff as an immediate threat.  The second factor, then, weighs in Plaintiff's favor as well.

The third factor – whether the plaintiff was resisting arrest or attempting to flee – does not weigh in favor of either Plaintiff or Officer Mora.  After Officer Mora ordered Plaintiff to put his arms behind his back, Plaintiff did not immediately do so; instead, he repeatedly asked Mora why he was being arrested.  Compl. at ¶ 12.  Based on these facts, Officer Mora may have a viable argument that Plaintiff initially resisted arrest.  After Plaintiff was subdued, however, Officer Mora allegedly inflicted further injury by grinding Plaintiff's head into the pavement.  *Id.* at ¶ 13.  Thus, Plaintiff's allegations would support a finding that, even if Plaintiff initially resisted arrest, at

17

least part of Officer Mora's illegal actions took place after the resistance had ceased.

The Court finds that Plaintiff has stated a claim against Officer Mora for his unconstitutional use of excessive force.  Taking all of Plaintiff's allegations as true, Plaintiff's failure to comply immediately with Officer Mora's command to put his arms behind his back does not outweigh Plaintiff's assertion that he was innocent of any crime and the allegedly non-threatening nature of his actions.  Even if the Court found that Plaintiff had initially resisted arrest, the claim for excessive force would remain based on the allegation that Officer Mora further injured Plaintiff after he had been taken to the ground.

ii. <u>John Does One and Two – Constitutional</u>

<u>Violation</u>

The excessive force claim against John Does One and Two is a closer issue.  Plaintiff alleges that Officer Mora called for assistance as he moved toward the car in which Plaintiff was a passenger.  When Plaintiff did not immediately comply with Officer Mora's instructions to put his hands behind his back, John Doe One and Two picked Plaintiff up bodily.  Mora then put Plaintiff into a headlock and dropped him to the ground, and John Does One and Two "forced the rest of Mr. Harrison's body to the ground, face first."  Compl. at ¶¶ 13-14.  Later in the Complaint, Plaintiff recounts the same event more concisely: "By

18

grabbing and slamming [Plaintiff] to the ground so that his head struck the ground, Defendants John Mora, John Doe One, and John Doe Two assaulted and battered [Plaintiff] . . .".  Compl. at ¶ 54.

Judged from the perspective of a reasonable officer at the time of the claimed violation, it is not immediately obvious that the alleged actions of John Does One and Two were unconstitutionally excessive.  John Doe One and John Doe Two approached Plaintiff after a fellow-officer, Officer Mora, called for assistance.  *Id.* at ¶ 11.  Given the paucity of facts available at this stage, it is unclear whether John Does One and Two were aware of the reasons – or lack of reasons – for Officer Mora's actions.  At this stage, the Court must construe the allegations in the Complaint in favor of Plaintiff.  Thus, the Court cannot definitively find that John Does One and Two were assisting an officer with a "suspect" who was resisting what appeared to be a valid arrest rather than, instead, "grabbing and slamming" an innocent citizen to the ground without provocation. Compl. at ¶ 54.  Likewise, the Court at this time cannot say whether Plaintiff posed a threat to the officers or to others at the scene.  *Graham v. Connor*, 490 U.S. at 396.  Without more facts, the Court is unprepared to find the actions of John Does One and Two "objectively reasonable" at the motion to dismiss stage.

iii. <u>Whether the Mistake was Reasonable</u>

The second qualified immunity inquiry asks whether the defendant officers' allegedly mistaken belief that they could apply the amount of force recounted in the Complaint was nonetheless reasonable.  The constitutional violation alleged by Plaintiff – that police officers used too much force to subdue him during an arrest – is a common claim, not a rare or otherwise unusual one.  The case does not present a novel situation in which the actions taken may have violated a new or vague constitutional rule such that the "mistake" could be reasonable.  And, regarding Officer Mora, even if the initial "take-down" was found to be within the parameters of qualified immunity, the allegation that he then ground Plaintiff's face into the pavement suffices to state a wholly gratuitous use of force unrelated to the cause for arrest.  At the motion to dismiss stage, the Court cannot find that the defendant officers are entitled to qualified immunity as to Claim Three.

c. <u>Count IV: Denial of Medical Attention</u>

Plaintiff claims that Defendants Mora and John Does One through Six unconstitutionally denied him medical attention (Count IV).[3]  The Fourteenth Amendment requires "the responsible

---

[3] Count IV of the Complaint is stated against Defendants generally, but in his Opposition to Defendant's Motion, Plaintiff argues that Officer Mora and John Does One through Six violated his right to receive medical care.  *See* Compl. at ¶ 46; Pl.'s Opp'n at 14.  Plaintiff suggests that the rest of the Defendants are liable for Counts I-IV and Count VI via Plaintiff's conspiracy claim.  Pl.'s Opp'n at 17.

government authorities to provide medical care to persons . . .
who have been injured while being apprehended by the police."
*City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983).  A
pre-trial detainee can show a due process violation by
demonstrating a "deliberate indifference to serious medical
needs."  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *see Gray v.
Farley*, 13 F.3d 142, 146 (4th Cir. 1993).

       "Deliberate indifference is a very high standard," and
"a showing of mere negligence will not meet it."  *Grayson v.
Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (citing *Estelle*, 429 U.S.
at 105-06).  It requires "'more than ordinary lack of due care
for the prisoner's interests or safety.'"  *Id.* (quoting *Whitley
v. Albers*, 475 U.S. 312, 319 (1986)).  To prove deliberate
indifference, a plaintiff must show that the defendant "actually
knew of and disregarded a substantial risk of serious injury to
the detainee" or "actually knew of and ignored a detainee's
serious need for medical care."  *Young v. City of Mt. Ranier*, 238
F.3d 567, 575-76 (4th Cir. 2001) (citation omitted).

       Plaintiff's Complaint states that he asked Officer Mora
for medical attention and that Officer Mora, John Doe One, John
Doe Two, and the other officers at the scene – including,
presumably, John Does Three through Five – "knew about
[Plaintiff's] injury because they had witnessed the event. . . .
[and because] the injury was visible."  Compl. at ¶¶ 19-20.  The
officers then "deliberately refused to give [Plaintiff] access to

medical care." *Id.* at ¶ 20.  When Plaintiff appeared at the
Garfield substation and again requested medical care, John Doe
Six told him to wash his face.  *Id*. at ¶ 22.

The Complaint also states, however, that Plaintiff was
conscious after his arrest and that one of the officers at the
scene, after hearing a request for medical attention, told
Plaintiff that a squad car was on the way and that the officer
driving that car would provide Plaintiff with medical attention.
*Id.* at ¶ 19.  The officer who drove Plaintiff to the PWCPD
Garfield substation told Plaintiff that he would be treated at
the substation.  *Id.* at ¶ 21.

Whether the deliberate indifference claim should
survive the motion to dismiss is a close issue.  The Court finds
that it is one better reserved for a later stage of this
litigation, after the facts have been developed in a way that
will allow the Court to assess how "serious" Plaintiff's medical
needs would have appeared to be at the scene of the incident and
at the Garfield substation.

The Complaint states that Plaintiff was tackled and hit
his head, that he was seeing double, and that he made repeated
requests for medical care.  Compl. at ¶¶ 19, 22.  One could
fairly infer from the Complaint that the injuries were visibly
serious enough for Christopher, Plaintiff's companion, to notice
their severity and request medical assistance for Plaintiff.  *Id.*
at ¶ 19.  While the Complaint does not allege that Plaintiff was

bleeding profusely, it does indicate that there were at least some visible signs of trauma to Plaintiff's face. *Id.* at ¶ 22. At the pleading stage, which is governed by the notice pleading standard of Rule 8, these allegations are sufficient to allege that a reasonable officer would have realized that there was a "substantial risk of serious injury" or a "serious need for medical care." *Young*, 238 F.3d at 576.

It is also unclear from the face of the Complaint whether one officer's statement that Plaintiff would be treated later, by another officer arriving at the scene, undercuts Plaintiff's claim that the officers demonstrated the "more than ordinary lack of due care for the prisoner's interests or safety" required to claim a constitutional violation. *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (quotation omitted). Liberally construing the Complaint in favor of Plaintiff, however, it is plausible that the actions of the other Defendant officers were intended to delay treatment and keep Plaintiff from receiving medical care.

Finally, the Court finds that, at least at this early point in the litigation, qualified immunity does not shield the Defendant officers from the deliberate indifference claim. The right of criminal suspects to receive adequate medical treatment for injuries caused by the police has been extant since at least the *City of Revere v. Massachusetts General Hospital* decision. 463 U.S. 239 (1983). The Court notes that it is difficult,

without more facts, to situate the relevant actions or inactions of the Defendant officers within the case law on deliberate indifference.  The safer course is to allow Plaintiff's claim to survive the motion to dismiss.  It can be taken up again after both parties have had an opportunity to develop the relevant facts.

### d. <u>Count VI: Equal Protection Violations</u>

Plaintiff's sixth claim, for "equal protection violations," states that "Defendants discriminated against [Plaintiff] on the basis of race resulting in physical injury and other damages . . . ."  Compl. at ¶ 52.  The Complaint states that, on two occasions, Officer Mora referred to Plaintiff using an invidious racial slur.  *Id.* at ¶¶ 14, 18.  He allegedly uttered one of the slurs while pushing Plaintiff's head into the pavement.  *Id.* at ¶ 14.

"To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination."  *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001).  Under some circumstances, racial profiling can lead to a finding of an equal protection violation.  *Green v. Maroules*, 211 Fed. Appx. 159, 162 (4th Cir. 2006).  Racial statements can serve as evidence of discriminatory intent.  *See Mullen v. Princess Anne Volunteer Fire Co.*, 853 F.2d 1130, 1133

(4th Cir. 1988) (citation omitted).

Racial epithets, however, do not themselves implicate constitutional rights and cannot, on their own, form the basis of a constitutional claim.  *See Martin v. Harrison County Sheriff's Dept.*, 2006 WL 3760132, at *3 (N.D. W. Va. Dec. 15, 2006).  "But when the racially derogatory language is coupled with conduct infringing the prisoner's right to security of his person, an inference arises that the conduct was motivated by racial bias."  *Burton v. Livingston*, 791 F.2d 97, 101 n.1 (8th Cir. 1986); *but cf. Canada v. Booth*, 2008 WL 1969499, at *8 (W.D. Va. May 6, 2008) ("plaintiff's allegation that [defendant] directed racial slurs towards him during the . . . incident is insufficient to state a constitutional violation").

At this preliminary stage of the litigation, the Court finds that the allegations in the Complaint are sufficient to state a claim for an equal protection violation against Officer Mora.  Defendants have not expressly challenged this claim against Officer Mora in their memoranda in support of dismissal.  They are free to raise a qualified immunity defense against the equal protection claim at the summary judgment stage.

A third allegation, that John Doe Ten told a friend of Plaintiff's not to "act all ghetto" while at the hospital to which Plaintiff was taken, does not state a violation of Plaintiff's constitutional rights.  The statement was directed at a friend of Plaintiff; Plaintiff – who was on his way to the

hospital in an ambulance – could not have heard it.  Damages are available under § 1983 for actions that violate constitutional rights and "cause[] compensable injury."  *Carey v. Piphus*, 435 U.S. 247, 255 (1978) (quotation omitted); *see also Price v. City of Charlotte*, 93 F.3d 1241, 1245 (4th Cir. 1996).  Any theory tying John Doe Ten's statement to an injury suffered by Plaintiff would be too attenuated to survive.  The Court will dismiss the equal protection claim against John Doe Ten.

Plaintiff's Complaint contains no other allegations suggesting that any other defendant acted based on racial animus or discriminated against Plaintiff based on his race.  Plaintiff has not set out a prima facie case that any individual other than Officer Mora treated him differently than other similarly-situated persons because of his race.  Claim Six will be dismissed as to all defendants other than Officer Mora.

### 3. Count V: Conspiracy to Violate Civil Rights

Plaintiff's fifth claim, for conspiracy to violate civil rights, states that Defendants agreed to beat him and then cover up their actions by falsely arresting and prosecuting him, and denying him medical attention.  Compl. at ¶ 49.  Through this claim, Plaintiff asserts that all Defendants are liable for Counts One to Four (false arrest, unconstitutional search and seizure, excessive force, and denial of medical care) and Count Six (equal protection violations).  Pl.'s Opp'n at 17.

To state a claim for conspiracy to deprive an

individual of a constitutional right in violation of § 1983, Plaintiff must allege that defendants (1) "acted jointly in concert" and (2) performed an overt act (3) "in furtherance of the conspiracy" that (4) resulted in the deprivation of a constitutional right. *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996) (citing *Hafner v. Brown*, 983 F.2d 570, 577 (4th Cir. 1992)); *see also Davis v. County of Amherst*, 2008 WL 591253, at *3 (W.D. Va. Mar. 3, 2008). While Plaintiff does not need "to produce direct evidence of a meeting of the minds" to prove his claim, ultimately he will have to "come forward with specific circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective." *Id.* (citing *Hafner*, 983 F.2d at 576-77). Additionally, "courts have . . . required that plaintiffs alleging unlawful intent in conspiracy claims under § 1985(3) or § 1983 plead specific facts in a nonconclusory fashion to survive a motion to dismiss." *Gooden v. Howard County, Md.*, 954 F.2d 960, 969-70 (4th Cir. 1992) (citations omitted).

Plaintiff argues that Officer Mora and John Does One and Two "worked together in tacit agreement to use an amount of force to seize and arrest [Plaintiff] that was excessive under the circumstances." Pl.'s Opp'n at 19 (citing Compl. at ¶¶ 11-14, 49). Liberally construing the Complaint in favor of Plaintiff, the Court finds that he has stated a valid conspiracy claim against these three officers. The facts recounted in the

Complaint do not allow for a precise reconstruction of the events leading up to the "take down" of Plaintiff.  If the facts later show that John Does One and Two arrived on the scene to encounter an unfamiliar suspect resisting arrest, it will be difficult for Plaintiff to maintain a conspiracy claim against them.  At this stage of the proceedings, however, the claim survives.

The facts alleged in the Complaint, however, clearly rule out a conspiracy to falsely arrest or illegally search and seize Plaintiff.  Of all the defendants, only Officer Mora had any interaction with Plaintiff before the contested events. Officer Mora approached and seized Plaintiff before any other defendant became involved.  The Complaint claims that Officer Mora, not John Does One and Two, falsely arrested and unlawfully seized Plaintiff.  Compl. at ¶ 37.  It would have been impossible for any other police officer to know what Officer Mora intended to do, or why he intended to do it, before Officer Mora himself acted.  Conspiracy by its very nature requires more than one person; it requires an agreement between two or more parties to inflict harm.  *See Hafner*, 983 F.2d at 576 n.6.  Plaintiff cannot expand the reach of his first three claims to include all other Defendants by alleging that they conspired with Officer Mora after the complained-of acts were completed.

Plaintiff's allegations do state a plausible claim that various defendants acted to cover up the purported illegality of Officer Mora's actions.  The actions that several defendants

allegedly took to cover up constitutional violations could be construed as violating Plaintiff's due process rights.  Plaintiff suggests that the cover-up began when Officer Mora, along with John Does Three, Four, and Five, discussed the legal charges they could bring against Plaintiff and Christopher after they had arrested the latter.  Compl. at ¶ 18.  The Complaint also alleges that they had no justification for any charge against Plaintiff. *Id.* at ¶ 15.  During this discussion, the Complaint claims, Officer Mora repeated the racial slur that he had used earlier. *Id.*  Later, at the Garfield station, John Doe Six supposedly attempted to hide papers that would create a record of the care offered to Plaintiff.  *Id.* at ¶ 22; Pl.'s Opp'n at 20.

At this preliminary stage of the litigation, these allegations are sufficient to allow a cause of action for conspiracy to survive as to these defendants.  Plaintiff claims that a number of police officers conspired to cover up constitutional violations against him.  In doing so, they discussed which false charges to bring against Plaintiff and agreed to charge him with "swear and abuse" and disorderly conduct although he had done nothing wrong, thus furthering the cover-up conspiracy.  At the Garfield substation, John Doe Six allegedly took part in the cover-up by trying to hide papers indicating whether Plaintiff had received medical care.  Compl. at ¶ 22.  While it is not clear at this stage exactly what constitutional injury Plaintiff claims as a result of the alleged

cover-up, courts have allowed § 1983 "cover-up" claims to proceed based on an individual's due process right of access to the courts or where the cover-up leads to false arrests and false charges. *See, e.g.*, *Waller v. Butkovich*, 584 F. Supp. 909, 941 (D. N.C. 1984).

Plaintiff claims that the conspiracy among the PWCPD officers continued at a family friend's home and the hospital. According to the Complaint, John Does Seven through Ten and Officer Sullivan also played a role in the cover-up on October 5, 2005. After Plaintiff's girlfriend called 911 about his seizure, Plaintiff claims, PWCPD units arrived and John Does Seven through Nine entered the house. During both 911 calls, Plaintiff's girlfriend had told the operator that he had been beaten by police officers earlier in the day. After arriving at the house, John Doe Seven "began trying to interrogate [Plaintiff] . . . . ask[ing him] whether he had been drinking or using drugs." Compl. at ¶¶ 25-26. The officers said they were securing the area and that an ambulance was on the way. *Id.* at ¶ 28.

Plaintiff further alleges that a number of officers delayed the arrival of medical personnel and isolated him from his family and friends at the hospital. He asserts that Officer Sullivan interrogated him at the hospital, asking him about alcohol or drug use that would explain his medical problems. If proved, a jury could infer that these defendants were attempting to cover up the earlier incident by isolating Plaintiff and

pressing him to give alternative reasons for his seizure.  Thus, at this stage of the litigation, these allegations are sufficient to state a claim for conspiracy.[4]

### 4. Count VIII: Intentional Infliction of Emotional <u>Distress</u>

Count VIII is a state-law claim for intentional infliction of emotional distress ("IIED").  Compl. at ¶¶ 56-58. To succeed on an IIED claim in Virginia, a plaintiff must allege, and then prove by clear and convincing evidence, that: (1) "the wrongdoer's conduct is intentional or reckless"; (2) "the conduct is outrageous and intolerable"; (3) "the alleged wrongful conduct and emotional distress are causally connected"; and (4) "the distress is severe." *Russo v. White*, 400 S.E.2d 160, 162 (Va. 1991); *see Almy v. Grisham*, 639 S.E.2d 182, 186 (Va. 2007); *Womack v. Eldridge*, 210 S.E.2d 145, 148 (Va. 1974).  The cause of action is generally unfavored.  *Almy*, 639 S.E.2d at 187.

On IIED claims, "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme

---

[4] The Complaint can be read to assert a conspiracy claim under 42 U.S.C. § 1985(3) as well as a similar claim under 42 U.S.C. § 1983.  Compl. at §§ 1, 48-50; *see Griffin v. Breckenridge*, 403 U.S. 88, 102-03 (1983).  A § 1985(3) conspiracy claim requires a plaintiff to show that defendants (1) entered into a conspiracy, (2) to deprive a person of the equal protection of the laws, and (3) committed an act in furtherance of the conspiracy that (4) injured the plaintiff.  This claim requires an additional showing of motivation by "racial, or perhaps otherwise class-based, invidiously discriminatory animus." *Carpenters v. Scott*, 463 U.S. 825, 835 (1983).  Because the Court finds that Plaintiff's § 1983 conspiracy claim survives the motion to dismiss, there is no need to consider whether such a claim brought pursuant to § 1985(3), which includes the additional requirement of "invidiously discriminatory animus," was properly pleaded.  *Id.*

in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Russo*, 400 S.E.2d at 162 (quotation omitted). "[L]iability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Gaiters v. Lynn*, 831 F.2d 51, 53 (4th Cir. 1987). In upholding a lower court's dismissal of an IIED claim, the Virginia Supreme Court stated in *Russo* that "liability arises only when the emotional distress is extreme, and only where the distress inflicted is so severe that no reasonable person could be expected to endure it." 400 S.E.2d at 163 (citation omitted). Moreover, the *Russo* court noted that the IIED tort is non-tactile in nature. *Russo*, 400 S.E.2d at 162.

The Virginia Supreme Court has held that a plaintiff making a claim for IIED "must allege . . . all facts necessary to establish the cause of action." *Almy*, 639 S.E.2d at 187. In *Hatfill v. New York Times Co.*, however, the Fourth Circuit explained that, when an IIED claim is brought in federal court and the pleading standards of Rule 8 apply, a plaintiff does not have to allege the actual emotional distress suffered with the particularity required by the Virginia state courts. 416 F.3d 320, 337 (4th Cir. 2005); *see Perk v. Worden*, 475 F. Supp. 2d 565, 571 (E.D. Va. 2007).

At trial, of course, Plaintiff must be able to prove that the distress inflicted on him was so severe that "no

32

reasonable person could be expected to endure it."  *Russo*, 400

S.E.2d at 163.   In *Russo*, the court found that even if the

plaintiff could have proved that she was "nervous, could not

sleep, experienced stress and its physical symptoms, withdrew

from activities, and was unable to concentrate at work," she

would not be able to recover.  *Id.*

As an initial matter, the Court notes that the IIED

claim cannot proceed against the PWCPD, an entity, or against

Chief Deane, neither of whom was alleged to have committed an

intentional or reckless wrong against Plaintiff.  *See Russo v.*

*White*, 400 S.E.2d 160, 162 (Va. 1991).

At this stage of the litigation, the allegations in the

Complaint are sufficient to plead an IIED cause of action against

Officer Mora.   Plaintiff suggests that Officer Mora took action

against him to "teach him a lesson," that is, not to talk to a

female officer.  Pl.'s Opp'n at 30.  Officer Mora's purported

methods – pairing a racial slur with physical abuse – were

alleged to be intentional, and his conduct could be regarded as

"outrageous."   While the only emotional distress claimed by

Plaintiff occurs in the list of injuries in the Complaint –

"[p]hysical pain and suffering and *emotional trauma and*

*suffering*, requiring the expenditure of money for treatment" –

this is a sufficient allegation under Rule 8.  Compl. at ¶ 35(d)

(emphasis added); *see* Fed. R. Civ. P. 8(a); *Hatfill v. New York*

*Times Co.*, 416 F.3d 320, 337 (4th Cir. 2005).

Plaintiff has stated that the other Defendant officers "swarmed to his house while he suffered from the effects of a seizure," interrogated him while he awaited medical attention, and delayed medical assistance while attempting to conceal evidence of a racially-motivated beating. Compl. at ¶¶ 19-22, 25-26, 30, 33-34; Pl.'s Opp'n at 30. While the sufficiency of the allegations supporting the IIED claim is a closer issue against the other Defendant officers than against Officer Mora, these allegations are sufficient to state a claim for IIED against the other Defendant officers under Rule 8. Construing the facts in the Complaint in favor of Plaintiff, it is plausible that a jury could find such actions "outrageous and intolerable," and that they go "beyond all possible bounds of decency." *Russo*, 400 S.E.2d at 162. Given the fact-intensive nature of the IIED inquiry, the claim is better reserved for summary judgment or trial. The Court will not dismiss the IIED claim at this time.

### 5. Liability of Police Chief Deane and the PWCPD

Defendants argue that Chief Deane and Prince William County, which operates the PWCPD, should be dismissed from the lawsuit because Plaintiff has not alleged an unlawful policy, custom or training on the part of the PWCPD and because the Complaint contains no allegations about any action taken by Chief Deane. Defs.' Rebuttal at 19-20.

A local governing body may be sued under § 1983 when

unconstitutional actions are taken in the course of executing a governmental policy or custom. *Monell v. Dept. of Social Servs.*, 436 U.S. 658, 694 (1978). "Where the constitutional deprivation is not an official act of the municipality," though, "recovery lies only against the officer in his official capacity." *Moultrie v. Mitchell*, 1995 WL 24891, at *1 (4th Cir., Jan. 18, 1995) (citing *Hughes v. Blankenship*, 672 F.2d 403, 405-06 (4th Cir. 1982)). Where there is no evidence that the municipal agent "is responsible for any alleged constitutional violation . . . or that [a plaintiff] suffered any injury as the result of the execution of any governmental policy or custom," dismissal is proper. *Moultrie*, 1995 WL 24891, at *2. Additionally, it is well established that respondeat superior liability does not exist under § 1983. *See Sandlin v. Johnson*, 643 F.2d 1027, 1029 n.3 (4th Cir. 1981).

The Complaint does contain cursory allegations about local government policy and custom. It states that "Police Chief Deane has responsibility over the policies and procedures of the police officers under the employ of the PWCPD," and that the "PWCPD has responsibility over the policies and procedures of the police officers under its employ." Compl. at ¶¶ 6-7. It further alleges "that the denial of medical attention and the conspiracy to cover up the violations of [Plaintiff's] civil rights in violation of the Fourth, Eighth, and Fourteenth Amendments and of [state law] was a result of policies and customs of the [PWCPD]."

35

Compl. at ¶ 2.  Plaintiff argues that these allegations are sufficient to make Chief Deane and the PWCPD liable on each claim to the extent that any injuries or legal violations "arise from an affirmative policy or procedure or a failure to adequately provide policies and procedures."  Pl.'s Opp'n at 17.

Plaintiff, though, did not allege that the false arrest, unlawful seizure, or use of excessive force were the result of any policy, custom, or procedure of the PWCPD.  Those claims will be dismissed as to Chief Deane and the PWCPD.  While the allegations of policy and custom related to the other claims in the Complaint are somewhat conclusory, they are sufficient to state a cause of action so long as no other immunity or pleading failure bars the claims.

a. <u>Liability of the PWCPD</u>

Here, Plaintiff has alleged that the PWCPD's policies were responsible for the denial or medical attention and the ensuing cover-up conspiracy.  The PWCPD, however, is not an entity subject to suit under § 1983.  It is merely an arm of Prince William County.  "In Virginia, an operating division of a governmental entity cannot be sued unless the legislature has vested the operating division with the capacity to be sued." *Muniz v. Fairfax County Police Dept.*, 2005 WL 1838326, at *2 (E.D. Va. Aug. 2, 2005) (citing *Davis v. City of Portsmouth*, 579 F. Supp. 1205, 1210 (E.D. Va. 1983), *aff'd* 742 F.2d 1448 (4th Cir. 1984)); *see also Mobley v. City of Chesapeake*, 2006 WL

4738661, at *3 (E.D. Va. Aug. 30, 2006); *Young v. City of Norfolk*, 62 Va. Cir. 307, 2003 WL 21730724, at *2 (Va. Cir. Ct. July 7, 2003).  The Court will dismiss the federal claims against the PWCPD.

> b. <u>Liability of Chief Deane – Official Capacity</u>

To the extent that Plaintiff has sued Chief Deane in his official capacity based on policies and procedures that led to constitutional violations, however, Plaintiff may have alleged a viable claim.  At this stage of the litigation, the Court will not dismiss the § 1983 claim against Chief Deane in his official capacity for Counts IV-VI.

> c. <u>Liability of Chief Deane – Personal Capacity</u>

Suits against government agents in their personal capacities "cannot succeed absent proof of some degree of personal involvement in the alleged deprivation of rights." *McDonald v. Dunning*, 760 F. Supp. 1156, 1160 (E.D. Va. 1991) (citing, *inter alia*, *Vinnedge v. Gibbs*, 550 F.2d 926, 928-29 (4th Cir. 1977)).  Plaintiff, whose only allegations about Chief Deane are that he oversees the policies and procedures of the PWCPD, has not claimed that Chief Deane was personally involved in the alleged rights deprivations or that he could be personally liable on a supervisory liability theory.  In an abundance of caution, however, the Court will analyze the Complaint to determine whether it states a personal capacity claim against Chief Deane under a supervisory liability theory.

Taking the allegations in the Complaint as true, they fail to establish a cause of action for supervisory liability. In the Fourth Circuit, a supervisory liability claim cannot rest on respondeat superior. *Carter v. Morris*, 164 F.3d 215, 221 (4th Cir. 1999). A claim for supervisory liability requires (1) "actual or constructive knowledge of a risk of constitutional injury"; (2) "deliberate indifference to that risk"; and (3) "an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Id.* (citation and quotation omitted). Supervisors can be liable where their "corrective inaction amounts to deliberate indifference or tacit authorization" of "a pervasive and unreasonable risk of harm from some specified source." *Id.* (citation and quotation omitted).

The conclusory allegations about Chief Deane – who was not alleged to have had any interaction with Plaintiff or any involvement in the constitutional violations, except for his promulgation of police department policies – are inadequate to state a claim for supervisory liability. The Complaint contains no allegations of prior bad acts on the part of Chief Deane from which "a pervasive and unreasonable risk of harm" could be found or even implied. *See id.* (noting that the district court properly dismissed the supervisory liability claim). Nothing in the Complaint suggests that Chief Deane was indifferent to the risk of constitutional violations. The Court will dismiss the

38

claims against Chief Deane in his personal capacity.

### 6. Sovereign Immunity as to State Law Claims

Defendants claim sovereign immunity as a defense against the state-law claims stated in the Complaint (IIED and assault and battery).  Defendants first argue that, to the extent that Prince William County is a defendant, it – along with the PWCPD – has sovereign immunity from all state law claims brought against it.

### a. Sovereign Immunity of the PWCPD

Under *Niese v. City of Alexandria*, 564 S.E.2d 127, 132-33 (Va. 2002), a municipality is immune from liability for the negligent acts or intentional torts of police officers under its employ that are committed during the performance of a governmental function.  The acts alleged here occurred during the performance of police duties – while PWCPD officers were executing a search warrant and cordoning off the apartment building where Plaintiff lived.  The immunity extends from the municipality to the municipality's police department.  *Young v. City of Norfolk*, 62 Va. Cir. 307, 2003 WL 21730724, at *2 (Va. Cir. Ct. July 17, 2003).  Sovereign immunity bars Plaintiff's state law claims against the County and the PWCPD.[5]

---

[5] As an alternative defense to state law claims against the County, Defendants argued that any such causes of action were barred by Plaintiff's failure to make an initial claim to the Board of County Supervisors, as required by Va. Code Ann. §§ 15.2-1243 to 152.-1249.  Because the Court finds that the County is has sovereign immunity from state law claims, it will not consider this alternative argument at this time.

### b. Sovereign Immunity of Other Employees

Sovereign immunity, however, does not extend to state employees who commit intentional torts. *Elder v. Holland*, 155 S.E.2d 369, 372-73 (Va. 1967). Thus, the state law claim for the intentional tort of assault and battery against Officer Mora, John Doe One, and John Doe Two, cannot be dismissed on sovereign immunity grounds. *See Glasco v. Ballard*, 452 S.E.2d 854, 856 (Va. 1995) (citation omitted) (recognizing assault and battery as an intentional tort). Likewise, sovereign immunity will not block an IIED claim.

### c. Sovereign Immunity of Chief Deane

Defendants also argue that Chief Deane is protected by sovereign immunity because he meets the four-part *Messina v. Burden* test. Sovereign immunity bars a state official's liability for negligence when the supposedly violative acts alleged involve important government functions and the exercise of judgment and discretion. *Messina v. Burden*, 321 S.E.2d 657, 660-61 (1984).

In this case, Chief Deane meets the standard for sovereign immunity. As police chief, he serves in a high position that involves the exercise of judgment and discretion and the execution of important government functions. The only potential liability he faces relates to matters implicating his discretion and judgment as a policymaker. Under *Messina*, sovereign immunity protects him from liability for negligence

40

committed in the exercise of his judgment and discretion.  *See Blackburn v. Town of Coeburn*, 2007 WL 1577506, at *3 (W.D. Va. June 1, 2007).

Plaintiff cites *Agyman v. Pierce*, 26 Va. Cir. 140, 1991 WL 835356 (Va. Cir. Dec. 11, 1991) in opposition.  In *Agyman*, the court relied on eighteenth and nineteenth century authority in deciding that sovereign immunity did not shield the defendant sheriff from respondeat superior liability for the intentional torts of his deputies.  This holding implicitly conflicts with *Messina* and more modern authority, which does not distinguish between the head of a police department and other discretionary government actors protected by sovereign immunity.  Other decisions of the Virginia Circuit Court – including a decision post-dating *Agyman* – allow the extension of sovereign immunity to police chiefs.  *See Verry v. Barry*, 71 Va. Cir. 318, 2006 WL 2578368, at *3-*4 (Va. Cir. July 27, 2006); *see also Sickles v. Peed*, 25 Va. Cir. 487, 1991 Va. Cir. LEXIS 340, at *3-*5 (Va. Cir. Nov. 18, 1991).  Sovereign immunity bars the state law claims against Chief Deane.

7. The Good Samaritan Act, Va. Code Ann. § 8.01-225

Virginia's "Good Samaritan" statute, Va. Code Ann. § 8.01-225, shields individuals from liability when, in good faith, they provide "emergency care or assistance, without compensation, to any ill or injured person" in various

41

situations.  Va. Code Ann. § 8.01-225(A)(1).  Defendants claim that the actions of John Doe Six, who allegedly told Plaintiff to wash his face after Plaintiff requested medical attention at the Garfield substation, should be protected by the Good Samaritan Act.  At the motion to dismiss stage – looking at the Complaint alone – the Court does not agree.  The Complaint's allegations as to John Doe Six are sufficient to imply bad faith, making the Good Samaritan Act inapplicable.  *See* Compl. at ¶ 22.

Defendants further suggest that the Good Samaritan Act shields all other defendants from suits for inadequate medical care.  Again, at this stage of the litigation, the Act alone would not shield them from liability: the Complaint alleges the failure to deliver medical care, while the Act protects those who, "[i]n good faith, *render* emergency care or assistance."  Va. Code Ann. § 8.01-225(A)(1) (emphasis added).

8. <u>Damages</u>

Defendants claim that punitive damages are unavailable because Plaintiff has not alleged bad faith or malicious acts. Defendants also assert that Plaintiff has not pled a viable cause of action because he did not claim to incur any medical bills. At this stage of the litigation, neither argument will suffice to dismiss a properly-pled cause of action.  Plaintiff claims to have suffered "[p]hysical pain and suffering . . . requiring the expenditure of money for treatment."  Compl. at ¶ 35(d). Defendants' contention that Plaintiff did not actually pay any

money because of his injuries is better suited for a summary judgment motion than a motion to dismiss.

Likewise, the failure to specifically allege bad faith and malice will not bar Plaintiff's claims at this stage of the litigation. *See Bannister v. Mitchell*, 104 S.E. 800, 801 (1920) (finding that punitive damages may be available for malicious assault and battery).

### IV.   Conclusion

For these reasons, the Court will (1) grant Defendants' motion to exceed the page limit in its reply brief, (2) grant Plaintiff's request to construe Defendants' motion as a motion to dismiss, and (3) grant in part and deny in part Defendants' motion to dismiss.

To summarize the Court's findings: (1) Count I, for false arrest against Officer Mora, will not be dismissed; (2) Count II, for illegal search and seizure against Officer Mora, will not be dismissed; (3) Count III, for excessive force, against Officer Mora and John Does One and Two, will not be dismissed; (4) Count IV, for deliberate indifference, against all Defendants, will not be dismissed; (5) Count V, for conspiracy to violate civil rights, will be dismissed except as to Officer Mora and John Does One and Two for the excessive force claim and against other Defendants to the extent that it alleges an unconstitutional "cover up"; (6) Count VI, for equal protection violations, will be dismissed as to all individual Defendants

43

except Officer Mora and Chief Deane in his official capacity; (7) Count VII, for assault and battery, against Officer Mora and John Does One and Two, will not be dismissed; (8) Count VIII, for IIED, will be dismissed against the PWCPD and Chief Deane; (9) all federal claims against the PWCPD will be dismissed; (10) all claims against Chief Deane in his personal capacity will be dismissed; (11) all claims against Chief Deane in his official capacity, except those for Counts IV-VI, will be dismissed; and (12) the County, the PWCPD, and Chief Deane all have sovereign immunity against Plaintiff's state law claims.

An appropriate Order will issue.


February 10, 2009                    _____/s/_____
Alexandria, Virginia                    James C. Cacheris
                                 UNITED STATES DISTRICT COURT JUDGE